**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Barry L. ROQUETTE, Defendant and Appellant.**

**Crim. No. 689.**

Supreme Court of North Dakota.

March 20, 1980.

Cynthia A. Rothe, State's Atty., and Mervin D. Nordeng, Asst. State's Atty., Cass County, Fargo, for plaintiff and appellee; argued by Mervin D. Nordeng, Fargo.

Schuster Law Offices, Fargo, for defendant and appellant; argued by James R. Brothers, Fargo.

PAULSON, Justice.

Barry L. Roquette ["Roquette"] appeals from a judgment of the Cass County District Court convicting him of the crime of arson, ·pursuant to § 12.1–21–01 of the North Dakota Century Code. We affirm.

On July 11, 1976, fire destroyed the building housing the Cripple Creek Lounge and other establishments in Fargo. Investigators determined that arson was the cause of the fire. Roquette was arrested on February 10, 1978, and charged with starting the fire that burned the Cripple Creek Lounge.

Investigation of the fire had commenced immediately and Roquette had been the principal suspect from the outset. During the nineteen months that the investigation was ongoing, Roquette was interviewed and questioned by the Fargo police several times. The police officers were so zealous, in fact, that one of these interviews was even conducted outside of their jurisdiction at Roquette's place of business at Hawley, Minnesota.

Officer James Lindblad of the Fargo Police Department and Deputy Michael Lyman of the Cass County Sheriff's Department arrested Roquette, pursuant to a warrant, on Interstate Highway 29 between Fargo and West Fargo. The police officers knew that Roquette was employed by Walkinshaw Trucking and had been informed by Roquette's employer that Roquette was to be at the intersection of I–29 and Cass County Highway 20 at about 3:00 p. m., in order to pick up a check from Walkinshaw's wife.

When he noticed that his truck was being followed by the police, Roquette pulled over to the shoulder of the road. Deputy Lyman showed Roquette a warrant for his arrest. The officers then took Roquette into custody and Officer Lindblad advised Roquette of his *Miranda* rights.[1] Within about an hour of his arrest, Roquette signed a confession at the Cass County state's attorney's office. His confession was found to be voluntary and was used against Roquette at trial.

Roquette was tried by a jury and the jury found him guilty of the crime of arson in connection with the burning of the Cripple

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Creek Lounge. A judgment of conviction was entered on March 28, 1979.

Roquette has raised the following three issues on appeal:

(1) Whether or not the defendant's Fifth Amendment rights were violated when the arresting officers, at the time of the defendant's arrest, continued to interrogate him despite his assertion of his right to remain silent, and subsequently secured a confession without a repetition of the *Miranda* warnings.

(2) Whether or not the confession secured by the police was free and voluntary under the totality of the circumstances.

(3) Whether or not it was reversible error for the trial court to instruct the jury to give the preliminary hearing testimony of the deceased witness such weight and credence as they would if the witness had been present in court and testified at the trial.

More pertinent facts will be presented as they relate to discussion of the issues.

### I.

The first issue is essentially whether or not Roquette's *Miranda* rights were violated by the arresting officers. It is undisputed that Officer Lindblad advised Roquette of his *Miranda* rights at the time of his arrest. What is in dispute is the question of whether or not Roquette asserted his right to remain silent. The right of the defendant to remain silent is a right which must be scrupulously honored. *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *State v. Thompson*, 256 N.W.2d 706 (N.D.1977). An essential element of the right to remain silent is the right to cut off questioning. The United States Supreme Court recognized this in the following passage from *Miranda, supra* 384 U.S. at 473–474, 86 S.Ct. at 1628:

"Once warnings have been given, the subsequent procedure is clear. If the individual *indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interroga-*

*tion must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." [Emphasis added.]

Roquette has directed us to excerpts from the transcript which support the fact that he did assert his right to remain silent. Officer Lindblad testified as follows:

"Q. Did you ask him whether he understood his rights?

"A. Yes, I did.

"Q. What did he indicate?

"A. He indicated that he understood his rights and he didn't want to talk about it at that time."

On cross-examination, Officer Lindblad reiterated his prior testimony as follows:

"Q. You read him his rights and he refused to speak?

"A. Right."

Officer Lindblad also testified that, after being advised of his rights, Roquette "shrugged his shoulders" and "indicated" that he did not want to talk.

Shortly after "indicating" to the police that he did not want to talk, Roquette began asking questions of the police. He specifically asked, "Why are you arresting me now?". This question was asked in the police car on the way to the police station from the scene of the arrest, approximately 15 or 20 minutes after Roquette was shown

the arrest warrant, was advised of his *Miranda* rights, and indicated a desire to remain silent. The police officers understood Roquette's question to be a request for information about the evidence against him, which they supplied. The police officers believed that Roquette's reopening of questioning revealed a desire to cooperate with them. They therefore drove directly to the state's attorney's office where Roquette gave the statement in which he confessed to the arson at the Cripple Creek Lounge.

Counsel for Roquette argues that Roquette should have been re-apprised of his *Miranda* warnings at the point where he reversed his decision to remain silent and began talking to the police officers. We disagree. Counsel interprets *Michigan v. Mosley, supra,* as requiring a fresh set of warnings each time questioning is resumed. In effect, counsel has urged us to create a *per se* rule that questioning can only resume after the warnings are repeated. We do not interpret *Mosley* that way.

We quote the following language from *Mosley, supra* 423 U.S. at 102–103, 96 S.Ct. at 326:

"To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, *and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.* Clearly, therefore, neither this passage [2] nor any other passage in the *Miranda* opinion *can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject,* once the person in custody has indicated a desire to remain silent.

"A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . .' 384 U.S., at 479, 86 S.Ct. 1602 at 1630, 16 L.Ed.2d 694 [10 Ohio Misc. 9, 36 Ohio Ops.2d 237, 10 A.L.R.3d 974]. The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning'. Id., at 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 [10 Ohio Misc. 9, 36 Ohio Ops.2d 237, 10 A.L.R.3d 974]. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored'." [Emphasis added.]

In *State v. Thompson, supra* 256 N.W.2d at 712, we recognized that a defendant can make an intelligent evaluation of new information and on that basis make an uncoerced and voluntary waiver of the right to remain silent. In *United States v. Davis,* 527 F.2d 1110, 1111 (9th Cir. 1975), *cert. den.* 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 196 (1976), a case factually similar to the instant case, the Court said:

". . . the right to talk or remain silent is the defendant's, and no mechanical application of *Miranda* should prevent the informed, voluntary, and free exercise of that right [*Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)]."

---

**2.** The passage from *Miranda* referred to by the *Mosley* Court is the same one which we have set out previously, taken from 384 U.S. at 473–474, 86 S.Ct. at 1627.

We believe that Roquette initially asserted his right to remain silent; that he thought things over for a short time; and that he then decided to open up and discuss his situation with the police.

Several factors in this case support our holding that *Miranda* was not violated. First, it was Roquette himself who resumed the questioning after he had asserted his right to remain silent. See *People v. Fioritto*, 68 Cal.2d 714, 68 Cal.Rptr. 817, 441 P.2d .625 (1968). Second, the time interval between the initial arrest and the resumption of questioning was sufficiently short to raise a presumption that Roquette was still aware of his rights.[3] Third, Roquette signed a statement acknowledging that he understood his rights within one hour of the time of the initial arrest. Fourth, his right to remain silent was scrupulously honored by the police until such time as he resumed the questioning. Our holding might be different in a situation involving resumption of questioning by the police, a longer time interval, or one of the *Miranda* rights other than the right to remain silent.

## II.

▮ The second issue raised on this appeal is whether or not Roquette's confession was made freely and voluntarily under the totality of the circumstances. This actually involves two determinations of voluntariness in this case. The first is whether or not the decision to waive the right to remain silent was voluntarily made. In *State v. Thompson*, 256 N.W.2d 706, 710 (N.D.1977), this court stated:

> "The State has a heavy burden to show a waiver of the constitutional right to remain silent, and that statements made after an indication of a wish to remain silent are, in fact, voluntary."

The second determination is whether or not the confession itself was made voluntarily.

The standard of review which we employ is whether or not a determination of volun-

tariness is manifestly against the weight of the evidence [*Thompson, supra* 256 N.W.2d at 710, reaffirming our pre-*Miranda* standard set out in *State v. Nagel*, 75 N.D. 495, 28 N.W.2d 665, 677 (1947)]. Roquette has pointed to several factors which he contends illustrate that his confession was not voluntary under the totality of the circumstances. These same factors were pressed before the district court and we conclude that the district court's determination that Roquette's confession was voluntary under the totality of the circumstances is supported by the evidence.

Roquette contends that the following factors combined to overbear his will: (1) that he is a long-haul trucker and for the past four months had been working 18 hours a day; (2) that he had had only three hours' sleep in the 72 hours preceding his arrest; (3) that he was under the influence of marijuana at the time of his arrest; (4) that there had been a pattern of police harassment in his case from the very beginning of the arson investigation; (5) that he blamed this police harassment for the loss of his business in Hawley, Minnesota; (6) and that he feared his present job with Walkinshaw Trucking was in jeopardy because of police harassment.

All of the above mentioned factors were considered by the trial court at the voluntariness hearing. The trial court concluded that Roquette did not lack capacity as a result of the use of marijuana and that Roquette wavered on various occasions regarding the amount of marijuana he had smoked prior to his arrest. The trial court found that the police activity was nothing beyond the strictures of normal police investigation. The trial court was in a much better position than we are to judge the credibility of the witnesses and weigh the relevant evidence. *State v. Engel*, 289 N.W.2d 204 (N.D. 1980). The trial court concluded that Roquette was not coerced and that his confession was totally volun-

---

**3.** See, generally, *White v. Finkbeiner*, 570 F.2d 194 (9th Cir. 1978); *United States v. Rodriguez-Gastelum*, 569 F.2d 482 (9th Cir. 1978), *cert. den.* 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760

(1978); *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976), *cert. den.* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977).

tary under the totality of the circumstances. We conclude that the evidence in the record supports the trial court's conclusion that Roquette's confession was voluntarily made.

### III.

 The State sought to introduce into evidence the testimony of a witness, Greg Lyon, who testified at the preliminary hearing but who died prior to trial. The trial court admitted the testimony over Roquette's objection. The trial court gave the following instruction to the jury regarding deposition testimony:

> "Depositions. During the trial, testimony was presented to you by way of deposition. The testimony of a witness who for some reason could not be present to testify in person may be presented in this form. Such testimony is under oath and it is entitled to neither more nor less consideration by you simply because it was so presented. You should give it such weight and credence, so far as possible, as you would if the witness had been present in Court and testified."

Roquette contends that the foregoing instruction was in error because it amounts to a usurpation of the function of the jury. He argues that the instruction amounted to a comment on the weight to be given the testimony of Greg Lyon. We disagree.

We note that the instruction given by the trial court was taken verbatim from No. 1004 of the North Dakota Jury Instructions prepared by the State Bar Association of North Dakota. A plain reading of this instruction by a reasonable jury would indicate to them that they could believe or disbelieve the testimony as though the witness were in court. The apparent purpose of the instruction is to protect the person it is introduced against by informing the jury that theirs is the final determination on the credibility of the testimony even though it was taken outside of their presence.

The instruction in question is consistent with the law in North Dakota. It is consistent with Rule 804(b)(1) of the North Dakota Rules of Evidence, which provides that tes-timony of a witness at a prior hearing or deposition may be received if the party whom it is offered against has an opportunity and similar motive to develop the testimony. As we recently said in *State v. Garvey*, 283 N.W.2d 153 (N.D.1979), the Rule 804(b)(1), NDREv, exception to the hearsay rule permits admission of testimony given at a preliminary hearing "even though the defendant may have had significantly less incentive to cross-examine the witness at the preliminary examination hearing than at the trial". *Garvey, supra* 283 N.W.2d at 156. At the preliminary examination, counsel for Roquette had the same opportunity (although we concede a lesser motive) to cross-examine Lyon as he would have had in court. At trial, counsel was able to introduce evidence which contradicted the evidence presented in Lyon's deposition. Therefore, the admission of the deposition testimony, and the instruction on how the jury was to treat it was made in accordance with law and not prejudicial to Roquette.

As we said in *State v. Erickson*, 241 N.W.2d 854, 861 (N.D.1976): "In determining whether a jury instruction is misleading, the instruction as a whole must be considered." *State v. Steele*, 211 N.W.2d 855 (N.D.1973). In *State v. Williams*, 150 N.W.2d 844 (N.D.1967), we held, in paragraph 3 of the syllabus:

> "3. Instructions must be considered as a whole, and if when so considered, they correctly advise the jury as to the law, it is sufficient, although a portion thereof standing alone may be insufficient or erroneous."

Roquette's argument seems to rely heavily on the fact that the words "weight and credence" used in the last sentence of the instruction imply an impermissible comment on the weight to be given the testimony of the deceased witness, Lyon. However, other portions of the same instruction clearly set out that the jury has the power to consider or disregard that testimony. Counsel did not offer an alternative instruction, although he did take exception to the instruction given regarding deposition testi-

mony. We find it difficult to conceive of an instruction which more clearly sets forth the state of the law in North Dakota.

Affirmed.

ERICKSTAD, C. J., and SAND, VANDE WALLE and PEDERSON, JJ., concur.